**In re SYMBOL TECHNOLOGIES CLASS ACTION LITIGATION.**

No. 92–CV–3492 (JG).

United States District Court, E.D. New York.

Jan. 13, 1997.

Jules Brody, Howard T. Longman, Stull, Stull & Brody, New York City, Steven G. Schulman, Joshua H. Vinik, Milberg Weiss Bershard & Lerach LLP, New York City, Joseph R. Sahid, Leslie B. Molder, Barrack, Rodos & Bacine, New York City and John Halebian, Matthew Houston, Wechsler Harwood Halebian & Feffer LLP, New York City, for Plaintiffs.

Eric Lobenfeld, Jill R. Moskowitz, Chadbourne & Parke LLP, New York City, for Defendants.

## MEMORANDUM AND ORDER

GLEESON, District Judge.

### Class Action.

Plaintiffs have brought this securities fraud class action on behalf of all persons who purchased the common stock of Symbol Technologies, Inc. ("Symbol"), during the period from June 8, 1992 to September 14, 1992. Defendants move for summary judgment. For the reasons set forth below, the motion is granted.

### BACKGROUND

Symbol is a high technology company in Bohemia, New York. It designs, manufactures, markets and sells bar code laser scanning systems, portable data collection systems and radio frequency data communications. Like many high technology compa-

nies, Symbol has a history of large, short-term fluctuations in profits, and its filings with the Securities Exchange Commission ("SEC") have consistently warned of the highly volatile nature of the company's stock price.

The Second Amended Complaint, filed on October 14, 1993, alleges (a) that Symbol and the five individual defendants [1] violated Section 10(b) of the Securities Exchange Act of 1934 (the "Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5; and (b) that all of the individual defendants except Archambault are liable under Section 20 of the Act, 15 U.S.C. § 78t, as control persons for the company's violations of Section 10(b) and Rule 10b–5.[2]

The case involves public announcements and press reports by Symbol during the class period. Plaintiffs point to three public statements by Symbol that they contend were false and misleading, effecting a fraud on the market that artificially inflated the price of Symbol shares. Symbol did not engage in a public offering of its securities during this period. Plaintiffs do not allege that Symbol has filed false statements with the SEC. Nor have plaintiffs alleged that Symbol or any of its officers or directors profited from this alleged fraud. To the contrary, the company and at least three of its senior officers were buying Symbol stock during the class period.

The backdrop to the statements at issue was as follows. In 1991, Symbol achieved record revenues ($319 million) and earnings per share ($0.90). Those numbers exceeded Symbol's 1990 performance by 30% and 173%, respectively. In late 1991, Symbol

prepared an internal business plan for 1992. This plan was referred to as the "Business Plan." After management discounted by approximately 5% the financial goals in the plan, it was submitted to the Board of Directors, which adopted a final product known within Symbol as the "Board Plan." The 1992 Board Plan projected revenues of $385 million and earnings per share of $1.20.[3] The Business Plan and the Board Plan were not updated during the year as performance information became available. Symbol contends that it was generally known, by the company as well as the investment community, that there could be no accurate prediction of the future performance of Symbol. Indeed, this was explicitly stated in Symbol's previous SEC filings.

Symbol's revenues and earnings per share in the first quarter of 1992 exceeded both the Board Plan forecasts and the results from the first quarter of 1991. The documents distributed before the regularly-scheduled board meeting on May 4, 1992, forecasted revenues of $396,666,000 (exceeding the Board Plan forecast by $11 million) and earnings per share of $1.19 ($0.01 less than the Board Plan forecast). Several days later, an internal Quarterly Business Review meeting resulted in the distribution of additional financial material.

On June 29, 1992, Symbol held another regularly-scheduled board meeting. At the meeting, management informed the board that earlier forecasts for the year's revenues and earnings per share might not be achieved unless an action plan were adopted to counter certain economic trends. Specifically, they warned that, in the event the plan

---

**1.** The individual defendants are Dr. Jerome Swartz, Chairman of the Board of Directors and Chief Executive Officer; Raymond Martino, former President and Chief Operating Officer, and a Director; Dr. Frederic Heiman, Executive Vice President and a Director; Thomas G. Amato, Senior Vice President and Chief Financial Officer; and Michael G. Archambault, Vice President of Investor Relations.

**2.** A cause of action against the individuals for aiding and abetting the company's alleged violation of Section 10(b) and Rule 10b–5 was withdrawn on February 10, 1995 in light of the Supreme Court's decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver,*

*N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).

**3.** Although the Board Plan was concededly an internal company document, plaintiffs allege that its forecasts were either known to the analysts or Symbol provided enough of the relevant information to the analysts that they adopted the same forecasts. Symbol disputes the contention that the Board Plan forecasts were anything other than internal company information. For the purposes of this motion, I will assume that plaintiffs' allegation that the Board Plan forecasts were known to the market is true.

were not followed, projected revenues would be decreased by $10 million (to $375 million) and earnings per share would be reduced by $0.19 (to $1.01). The action plan, it was predicted, would result in revenues of $380 million and earnings per share of $1.15.

Against this backdrop, plaintiffs contend that Symbol made three fraudulent statements. The first was a report dated June 8, 1992, in *Crain's New York Business*, which quoted an officer of Symbol, defendant Michael G. Archambault, as saying that Symbol "expect[ed] the second half of the year to be strong and to continue with the momentum that we exited 1991 with."

The second was made on June 26, 1992, a day that saw a marked increase in the buying and selling of Symbol shares. The New York Stock Exchange ("NYSE") halted trading in Symbol securities that afternoon to inquire into the reason for this increased activity. It turned out that short-sellers were spreading rumors that Symbol's earnings in the second quarter of 1992—earnings that would be announced imminently—would be lower than expected. At the request of the NYSE, Symbol issued a press release to rebut these rumors. The statement reassured investors, stating that the revenues and earnings per share for Symbol's second quarter would be even higher than in the first quarter.

The third purportedly misleading statement was made on July 22, 1992, when Symbol made its regularly-scheduled public announcement of its results for the second quarter. These results conformed with the statements contained in Symbol's press release of June 26, 1992. In the July 22, 1992, press release, Symbol again stated that it had achieved record revenues in the second quarter, and went on to state that "although we are pleased with our record revenues in the first half, we have concerns that contin-

ued weakness in the U.S. retail market could result in slower than expected growth in the second half of 1992." [4]

On September 14, 1992, Symbol publicly disclosed that it would sustain substantial losses in the second half of the year. This date marks the end of the class period.

## DISCUSSION

Defendants have moved for summary judgment pursuant to Fed.R.Civ.P. 56(c), contending that there is no genuine issue of material fact that would preclude judgment in their favor.[5] In a summary judgment motion, the burden is on the moving party to establish that no material facts are genuinely in dispute and that a review of the entire record demonstrates that the movant should be granted judgment as a matter of law. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 444 (2d Cir.1980) (citing cases). In resolving a motion for summary judgment, all ambiguities are resolved against the moving party and all reasonable inferences are drawn in favor of the party against whom summary judgment is sought. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–160, 90 S.Ct. 1598, 1608–1610, 26 L.Ed.2d 142 (1970). The moving party must show the absence of a genuine issue of material fact requiring trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1223 (2d Cir.1994). However, if the non-movant would bear the burden of proof on a claim at trial, the moving party can show that summary judgment is appropriate by "demonstrating an absence of evidence to support an essential element of such a claim." *In re Columbia Sec. Litig.*, 155 F.R.D. 466, 473–74 (S.D.N.Y.1994).

**4.** On August 20, 1992, Symbol announced that it would take a $6 million pre-tax charge to cover non-recurring costs. Plaintiffs no longer characterize this statement as false or misleading.

**5.** Plaintiffs argue that a motion for summary judgment is premature since discovery has not been completed. They have appealed Magistrate Judge Thomas E. Boyle's order dated May 15, 1996, denying plaintiffs' motion to compel fur-

ther discovery. Both the argument and the appeal from Judge Boyle's order are without merit. The appeal is hereby denied. Discovery is essentially complete; thousands of pages of internal documents have been produced, and plaintiffs have taken more than their allotted number of depositions of corporate officers and non-party witnesses.

Once defendants have shown the absence of a genuine issue of material fact, plaintiffs must present evidence that could support a jury verdict in their favor in order to defeat a summary judgment motion. *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995). The mere possibility that a factual issue may exist is insufficient to overcome a convincing presentation by the movant. *Gatling v. Atlantic Richfield Co.,* 577 F.2d 185, 187–88 (2d Cir.), *cert. denied,* 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 169 (1978). Rather, the opposing party must present some "affirmative indication that its version of relevant events is not fanciful," *Quinn,* 613 F.2d at 445, and "may not rest upon mere conclusory allegations or denials." *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978).

In order to defeat this Rule 56(c) motion, then, plaintiffs must point to specific, admissible evidence that, if believed, would cause a jury to find in their favor. *Azrielli v. Cohen Law Offices,* 21 F.3d 512, 517 (2d Cir.1994). In other words, plaintiffs' version of the case must be supported either by affidavits or other testimony based on personal knowledge, *Sellers v. M.C. Floor Crafters,* 842 F.2d 639, 643 (2d Cir.1988); *Beyah v. Coughlin,* 789 F.2d 986, 989–990 (2d Cir.1986), in order to proceed to trial.

■ In order to prove a violation of § 10(b) of the 1934 Securities Exchange Act, plaintiffs must prove that defendants (1) made a material misstatement or omission; (2) with the requisite scienter, or intent, to defraud; (3) in connection with the purchase or sale of securities; and (4) upon which plaintiffs relied, causing injury. *Brown v. E.F. Hutton Group, Inc.,* 991 F.2d 1020, 1031 (2d Cir.1993).

A. *The Actionability Of The Statements At Issue*

■ The first element of a § 10(b) claim is that actionable statements or omissions were made. *Brown,* 991 F.2d at 1031; *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 61 (2d Cir.1985). In order to be actionable, statements must have been false or misleading and relied upon by investors. Defendants cannot be held liable for state-

ments that were true when made; there is no "fraud by hindsight." *Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978); *see also Hershfang v. Citicorp,* 767 F.Supp. 1251, 1257 (S.D.N.Y.1991). The Second Circuit has recently reaffirmed that "defendants' lack of clairvoyance simply does not constitute securities fraud." *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 53 (2d Cir.1995) (citing *Denny,* 576 F.2d at 470).

■ Liability can also be predicated on a material omission that misleads investors as to the value of the securities at issue. An omission is actionable only if there was a duty to disclose the omitted information and the information is material. The mere fact that there is some adverse information that was not made public, for example, does not necessarily mean that there has been an actionable omission. *See Chris–Craft Indus., Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 363 (2d Cir.), *cert. denied,* 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973); *CL–Alexanders Laing & Cruickshank v. Goldfeld,* 739 F.Supp. 158, 164 (S.D.N.Y.1990). "Silence, absent a duty to disclose, is not misleading under Rule 10b–5." *Basic, Inc. v. Levinson,* 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 987 n. 17, 99 L.Ed.2d 194 (1988). There is no duty for a company to make affirmative statements, especially forecasts of future earnings, unless it is required to do so by a statute or it is necessary in order to prevent other statements from being misleading. *Glazer v. Formica Corp.,* 964 F.2d 149, 156 (2d Cir.1992); *Robbins v. Moore Medical Corp.,* 894 F.Supp. 661, 668 (S.D.N.Y.1995).

■ The Second Circuit has held that certain statements are not sufficiently definitive to give rise to § 10(b) liability. For example, § 10(b) liability cannot be premised upon "soft" statements of general optimism. *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Co., Inc.,* 75 F.3d 801, 811 (2d Cir.1996). Such "puffery cannot have misled a reasonable investor ... and cannot constitute actionable statements under the securities laws." *Id.* "[B]road, general statements" are "precisely the type of 'puffery' that this and other circuits have consistently held to be inactiona-

ble." *Lasker v. New York State Electric & Gas Corp.*, 85 F.3d 55, 59 (2d Cir.1996). Actionable statements must contain, or at least suggest, "definite positive projections" or statements of fact. *In re Time Warner, Inc., Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994); *see also Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 164 (2d Cir.1980); *Raab v. General Physics Corp.*, 4 F.3d 286, 289–90 (4th Cir.1993).

1. *The June 8 Statement Reported In Crain's*

 Archambault claims that he never made the statement attributed to him in the June 8, 1992 edition of *Crain's*. He asserts that he was misquoted. Whereas the article attributed to him the statement that Symbol "expect[ed] the second half of the year to be strong and to continue with the momentum that we exited 1991 with," Archambault testified that he had in fact referred to the *first half* of 1992 in his conversation with the reporter. Archambault's assertion is uncontradicted. Plaintiffs have failed to come forward with admissible evidence that contradicts it; they rely solely on the fact of publication, and their assertion that the jury will not believe Archambault, to raise a question of fact as to whether the statement was indeed made. I conclude that there is no genuine controversy over the fact that Archambault was misquoted.[6] In any event, even if Archambault made the statement as reported in *Crain's*, a statement that one "expects" to continue "momentum" is one of general optimism and thus is not actionable. *See San Leandro*, 75 F.3d at 811; *Time Warner*, 9 F.3d at 267; *Raab*, 4 F.3d at 289–90; *Hershfang*, 767 F.Supp. at 1256.

 Moreover, even if the sort of projection that Archambault reportedly made was actionable if false, plaintiffs have not presented any evidence that the statement was other than true when it was made. In fact, according to the documents and deposition testimony, on June 8, 1992, Symbol officers expected

that the momentum of 1991 would continue throughout 1992. By early June, the internal forecast for Symbol's earnings per share was only one cent lower than the original Board Plan's projection of increased growth; the internal forecast for revenues was higher than the Board Plan's projection. The plaintiffs contend that documents distributed internally for the Quarterly Business Review meeting on May 14, 1992, projected a decline in the revenues forecast in the Board Plan. However, the revenues discussed at the Quarterly Business Review meeting were product/equipment revenues, not total company revenues, and as such properly represented only a subset of the Board Plan's projected revenues. In fact, at the May Quarterly Business Review meeting, the company was still forecasting revenues for 1992 equal to those estimated in the Board Plan, the projection plaintiffs claim was publicly disclosed. These projections called for substantial revenue growth in the second half of 1992.

In an effort to salvage this allegation, plaintiffs contend that, whereas the 1992 Business Plan had projected growth in earnings of 23.9% in the first half of 1992 (compared to the first half of 1991) and 26.6% in the second half, the documents circulated for the May Quarterly Business Review revised this forecast downward, projecting "a *decline* in growth to just *17.9%* for the second half of the year." Plaintiffs' Memorandum In Opposition To Defendants' Motion For Summary Judgment, at 11 n. 2 (emphasis in original). However, a change in the degree of projected growth does not alter the fact that what is projected is growth, not decline. Here, a rational jury could not conclude that an internal projection of approximately 18% growth during the second half of the year was inconsistent with a public statement that a "momentum" (of growth) was expected to continue. Thus, even if Archambault had made the statement attributed to him in *Crain's*, plaintiffs have failed to come forward with facts

---

**6.** The statement, as quoted, makes no sense: A company cannot continue growth from the second half of one year into the second half of the next. In addition, the timing of the statement (in late May or early June—a month before the end

of the first half of the year) and a contemporaneous statement by Dr. Swartz to the shareholders that "the momentum of 1991 have rolled into '92" provide further evidence that the reporter mistakenly quoted Archambault.

that would support a determination that it falsely depicted the Company's expectations for growth as of June 8, 1992.

### 2. *The June 26 Press Release*

█ Plaintiffs concede that the press release of June 26, 1992, which related to the revenue and earnings for the second quarter of 1992, was true. However, they contend that it was misleading because by stating that it was responding to rumors started by short sellers, the company extended the statement into the future. Thus, by stating that earnings in the second quarter of the year would be high, it implied that earnings in the second half of the year would also be high. This argument is meritless.

There is no dispute that the press release was a direct response to a request by the NYSE to provide information to the public regarding the second quarter earnings for Symbol. The NYSE made this request because of the high trading volume in Symbol shares precipitated by rumors by short sellers that Symbol's second quarter earnings—which were soon to be officially announced—would be lower than expected.

No rational juror could find that the June 26, 1992, press release, which was explicitly directed to the second quarter of 1992, made an implied future projection of Symbol's revenue or earnings for the third and fourth quarters of that year. The statement itself, the context in which it was made (which was reiterated in the statement), and the analysts' interpretations of the statement all suggest that the statement was limited to assessing the second quarter earnings. Nothing suggests otherwise. Nor did the circumstances create a duty to comment on (or an expectation of information regarding) Symbol's future performance. *Caspary v. Louisiana Land and Exploration Co.,* 579 F.Supp. 1105, 1109 (S.D.N.Y.1983) (accurate report of company's present condition suggested no misimpression regarding future performance), *aff'd,* 725 F.2d 189 (2d Cir. 1984); *see also Schwartz v. Novo Industri, A/S,* 658 F.Supp. 795, 798 (S.D.N.Y.1987); *In re Convergent Tech. Sec. Litig.,* 948 F.2d 507, 514 (9th Cir.1991).

█ In any event, even if the statement could be regarded as forward-looking, there has been no showing that the defendants withheld any material adverse information. Three days after this press release, management met to discuss the potential course of Symbol's earnings and revenues for the second half of 1992. At that meeting, proponents of an action plan warned that earnings and revenues *could* fall off *if* the plan was not followed. The company decided to follow the action plan, and believed that by doing so the threatened decline in earnings and revenues would be averted. Plaintiffs have not alleged circumstances that show that defendants lacked a reasonable basis for the predictions of earnings and revenues based on the action plan. *San Leandro,* 75 F.3d at 813. Thus, even if there had been an implied forecast of continued growth in the June 26 statement, it would have been consistent with the facts as known and relied upon by Symbol management as of that date.

Specifically, the implementation of the action plan resulted in projected revenues of $380 million earnings per share of $1.15. These projections are lower by less than 1.5% and less than 5%, respectively, than the projections in the Board Plan. These slight changes in management's projections cannot, as a matter of law, support liability under the securities laws. *See Pavlidis v. New England Patriots Football Club, Inc.,* 675 F.Supp. 688, 692 (D.Mass.1986). Moreover, the inherently speculative nature of predicting Symbol's revenues, which demonstrate the "hockey stick" effect associated with realizing the majority of revenues in the third month of the quarter, would have rendered a late-June prediction of third quarter revenues tentative at best. *See In re HealthCare Compare Corp. Sec. Litig,* 75 F.3d 276, 282 (7th Cir.1996). On July 22, 1992, Symbol in fact announced that "weakness in [its] U.S. retail market could result in slower than expected growth in the second half of 1992." Thus, assuming *arguendo* that the June 26, 1992, statement included an implied projection, and that it was in material conflict with internal company projections, Symbol cannot properly be held accountable for waiting until July 22, 1992 to make its public statement. *Acito,* 47 F.3d at 53–54.

### 3. *The July 22, 1992 Statement*

 The July 22, 1992 press release announced record revenues in the first half of the year, but stated the company's "concerns" that there could be "slower than expected growth in the second half of 1992." Plaintiffs argue that the second part of the statement misled the market because Symbol expected a decline (*i.e.*, not just slower growth) in earnings per share.

The defendants respond by arguing that the statement relates only to revenues, not earnings. I agree; the statement does not refer to second-half earnings; it refers only to revenue growth. Plaintiffs' alternative claim—that the statement is misleading even if limited to second half revenues—also fails. In June 1992, Symbol was forecasting growth in revenues for the second half of the year. Although plaintiffs contend that certain internal documents reflect a projected decline in revenue for the *third quarter* of 1992, the allegedly actionable statement refers to the second half as a whole, as to which the company was indisputably forecasting a growth in revenues over second-half 1991. Defendants have shown that even though internal documents forecast a possible negative "growth" in the third quarter of 1992, these same documents predicted that fourth quarter earnings would rebound and that aggregate growth for the second half of the year would therefore be positive, although less than in the first half. Plaintiffs have not shown any evidence that casts doubt on defendants' claim that these were the projections available to and relied upon by the officers of Symbol as of July 22, 1992. Therefore, according to internal projections, the July 22, 1992 press release was not false when it was made. For these reasons, the third statement, like the first and second, is not actionable, and defendants' claims of securities fraud cannot stand.

Defendants' motion for summary judgment could be granted upon this finding alone. However, I also find that defendants' motion must be granted on the alternate ground that plaintiffs have failed adequately to support their allegations of scienter.

### B. *Scienter*

 To prevail on a securities fraud claim, plaintiffs must prove that each defendant had a mental state embracing an intent to deceive, manipulate and defraud. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976). Plaintiffs can show scienter by establishing a motive for committing fraud and a clear opportunity for doing so or by pointing to facts that give rise "to a strong inference of fraudulent intent." *Acito,* 47 F.3d at 52. Mere negligence is insufficient to support a § 10(b) claim, *Ernst & Ernst,* 425 U.S. at 198–99, 96 S.Ct. at 1383–84; conscious mischaracterization of facts or reckless disregard of facts must be shown. *Time Warner,* 9 F.3d at 268–69; *San Leandro,* 75 F.3d at 813. Plaintiffs have the "burden of pleading circumstances that provide at least a minimal factual basis for their conclusory allegations of scienter." *Chill v. General Electric Corp.,* 101 F.3d 263, 267 (2d Cir.1996). The failure to come forward with evidence from which a reasonable factfinder could find that defendants had the requisite scienter is an appropriate basis for granting summary judgment. *Mayer v. Oil Field Systems Corp.,* 803 F.2d 749, 756 (2d Cir.1986) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

 Plaintiffs do not allege a motive to commit fraud. This is not surprising, since the company and defendant Amato, as well as two high-ranking financial officers, purchased shares of Symbol stock during the class period. Plaintiffs attempt to establish scienter by resort to circumstantial evidence. They contend that any time there is an inconsistency between a company's public statement and information in its internal documents, then a jury may properly find scienter. (Transcript of Oral Argument dated April 19, 1996, at 62.) This is simply wrong, and ignores the Second Circuit standard described above.

Plaintiffs have not set forth any evidence of scienter with respect to the June 8, June 26 and July 22, 1992 statements. Even if those statements were actionable, a jury would have nothing upon which it could base a finding that defendants had the requisite

intent. Mere generalized allegations that defendants knew at the time of the statements that the predictions of continued growth were false are insufficient to defeat this motion. As discussed above, all of the internal documents support the assessments and projections in the three statements at issue. Plaintiffs have not pointed to any evidence, let alone "strong evidence," that defendants had or relied on information to the contrary. In light of the absence of evidence suggesting that defendants knew (or were reckless in not knowing) that the statements were false, there can be no finding defendants committed a fraud on the market. *See In re Caere Corp. Sec. Litig.*, 837 F.Supp. 1054, 1061 (N.D.Cal.1993); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).

Plaintiffs fail to recognize that they must demonstrate a genuine issue of material fact as to whether there was *fraud.* The evidence shows, at most, that Symbol's senior management relied on internal forecasts that turned out, in hindsight, to be inaccurate. This is not fraud. *Acito,* 47 F.3d at 53.

### C. *The § 20 Allegations*

Plaintiffs' allegations of § 20(a), or "controlling person," liability are predicated on a valid underlying § 10(b) claim. 15 U.S.C. § 78t; *In re VeriFone Sec. Litig.*, 11 F.3d 865, 872 (9th Cir.1993). If there is no § 10(b) securities fraud claim, there can be no related claim under § 20. *Bosio v. Norbay Sec., Inc.,* 599 F.Supp. 1563, 1568 (E.D.N.Y.1985). As discussed above, plaintiffs' § 10(b) claim fails as a matter of law. Therefore, plaintiffs' § 20(a) claim must be dismissed as well.

### CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is granted.

So Ordered.